**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| **XIQIU (“BOB”) FU, an individual,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **NO. 7:20-CV-257-DC** |
| | § | |
| **GUO WENGUI (a/k/a MILES KWOK, a/k/a WENGUI GUO, a/k/a MILES GUO, a/k/a HO WAN KWOK), an individual; GTV MEDIA GROUP, INC., a Delaware corporation, SARACA MEDIA GROUP, INC., a Delaware Corporation, and VOICE OF GUO MEDIA, INC., a Delaware corporation; and LIHONG WEI LAFRENZ (a/k/a SARA WEI) and DONGA FANG, individuals,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF’S MOTION AND APPLICATION FOR PRELIMINARY INJUNCTION**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff Bob Fu moves this Court for a preliminary injunction prohibiting Defendants, or anyone in concert with them, from picketing Dr. Fu’s home or from approaching within one-hundred (100) feet of Dr. Fu, his wife, or his children, and for such other relief as this court deems just and equitable. Additionally, Plaintiff requests that this Court enjoin Defendants, or anyone acting in concert with them, from picketing within fifty (50) feet of points of ingress and egress to ChinaAid’s business location, and from approaching within one-hundred (100) feet of ChinaAid employees.

## FACTS

This matter arises out of Defendants' persistent harassment of Dr. Fu and his family. Plaintiff refers the Court to his Complaint and submits the following exhibits in support of this motion for a preliminary injunction:

EXHIBIT A: Bob Fu Affidavit;

EXHIBIT B: Picketing Live-Stream Videos;[1]

EXHIBIT B-1: October 7, 2020 (00:38:00-00:39:00)

EXHIBIT B-2: October 21, 2020 First Portion (00:51:23-00:55:05)

EXHIBIT B-3: October 21, 2020 Second Portion (00:30:00-00:33:00)

EXHIBIT B-4: October 22, 2020 (00:26:00-00:30:00)

EXHIBIT B-5: October 27, 2020 (00:31:00-00:35:00)

EXHIBIT C: Arrest Records of Midland Picketers;

EXHIBIT D: Guo Wengui Videos;[2]

EXHIBIT D-1: The Global Traitor Elimination List

EXHIBIT D-2: Global 'Kill Cheaters' Campaign[3]

EXHIBIT D-3: Guo's September 28th Threat to Send Comrades to Midland

EXHIBIT D-4: Death Threats

EXHIBIT D-5: Another 'Kill Cheaters' Campaign

EXHIBIT E: Cease and Desist Letters to Defendants;

EXHIBIT F: Notice to Midland Police Department – Bob Fu is a stalking victim;

---

[1] To be delivered by USB drive

[2] To be delivered by USB drive

[3] This video is a composite of multiple clips which were prepared by a third-party and published on Twitter. The video first depicts Guo, and then to people wearing "Federation of New China" attire and committing violent acts. The Federation of New China is an organization affiliated with Guo.

| | |
|---|---|
| EXHIBIT G: | Midland Police Department - Bomb Threat Reports; |
| EXHIBIT H: | Google Earth Screenshot of Bishops Castle Drive, Midland, Texas |
| EXHIBIT I: | Jianmin Wu Request for Civil Harassment Restraining Order of Guo Operative (California); |
| EXHIBIT J: | Baosheng Guo Preliminary Protective Order (Virginia); |
| EXHIBIT K: | Toronto Star Article (Vancouver); |
| EXHIBIT L: | Liehong Zhuang Complaint (New York) against Guo; |
| EXHIBIT M: | Midland Reporter Telegram article; |
| EXHIBIT N: | Message From Sara Wei Declaring Intent to Return Picketing After Presidential Election; |
| EXHIBIT O: | Google Earth Screenshot of N.W. 100th Street in Clive, Iowa. |

Defendant Guo Wengui ("Guo") initiated a smear campaign that escalated from Guo making false and defamatory statements concerning Dr. Fu, to unwelcomed picketers targeting Dr. Fu and his home, which lasted for 27 days and seriously disrupted Dr. Fu's and his family's lives.[4] The number of picketers varied from day-to-day, but increased to approximately 100 individuals.[5] Defendant Guo vigorously advocates the use of violence against Dr. Fu by those Guo-solicited recruits and sponsors. Guo has induced these unlawful acts targeting Dr. Fu with promises of bounties for those who will eliminate/kill Dr. Fu.[6] Such is the threat by Guo and his compatriots that Dr. Fu and his family went into hiding–a law-enforcement-advised exile from their home.[7] Guo's followers are known to execute on his and his agents' commands against those Guo's

[4] Exhibit A at p. 2.
[5] *Id.* at p. 3; Exhibit B.
[6] Exhibit A at p. 2.
[7] *Id.* at p. 2.

targets.[8] Although there has been a respite from Guo's agents, they have vowed to return until Dr. Fu is eliminated.[9]

Without a preliminary injunction, Dr. Fu and his family are vulnerable to Guo's (and his agents' and followers') illegal attacks that deprive Dr. Fu and his family of a safe and tranquil home, rendering vulnerable these good Midland citizens during the pendency of this litigation.

## I. A PRELIMINARY INJUNCTION SHOULD ISSUE AGAINST DEFENDANTS

To halt Defendants' illegal conduct and to prevent continued harm to Dr. Fu, this Court should issue a Preliminary Injunction enjoining Defendants and those in concert with them, from future assaultive or harassing conduct; from picketing Dr. Fu's residence or on Bishops Castle Drive; from approaching within 100 feet of Dr. Fu, his wife, and children; and from picketing near Dr. Fu's work place (ChinaAid) .[10] Although Plaintiff requests that the Court waive a bond requirement, Dr. Fu is prepared to satisfy such a requirement if required by the Court to grant his requested relief.

### a. This Court Has Authority to Grant the Relief Requested

Section 85.003 of the Texas Civil Practice & Remedies Code authorizes Dr. Fu's civil cause of action for stalking. TEX. CIV. PRAC. & REM. CODE § 85.003. When a federal court decides to issue a preliminary injunction, it must consider whether (1) movant has a strong likelihood of success on the merits; (2) movant would sustain an irreparable injury without the order; (3) granting the injunction would cause substantial harm to others; and (4) the public interest is

[8] *See generally*, Exhibit I; Exhibit J; Exhibit K; Exhibit L.

[9] Exhibit A at p. 1; *see also* Exhibit N.

[10] It should be noted that Plaintiff is not requesting that this Court issue a content-based injunction relating to the picketers outside his home, rather, he requests a time, place manner injunction which does not run afoul of First Amendment Protections.

undermined by granting the order. *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014); *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990); *Northeast Ohio Coalition for Homess v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006). Also at issue is whether the requested relief satisfies constitutional requirements. It does. When the Texas Legislature codified Section 85.003, it declared, *inter alia*, that certain violations of privacy are actionable. Further, the requested relief is narrowly tailored because it acts only to restore the privacy of the home and the security of the workplace.

***i. Plaintiff is Likely to Succeed on His Civil Stalking Claims Given the Harassing Nature of the Picketers, Despite Being Asked to Stop or Provide Breathing Room.***

In order to succeed under Texas's Civil Stalking statute, a plaintiff must show, in relevant part:

1. on more than one occasion, defendant engaged in harassing behavior;
2. as a result of the harassing behavior, plaintiff reasonably feared for his safety or the safety of his family;
3. while engaging in harassing behavior by acts or words, a defendant threatened to inflict bodily injury on plaintiff or to commit an offense against plaintiff or a member of his family or property;
4. defendant had the apparent ability to carry out the threat;
5. defendant's apparent ability caused plaintiff to reasonably fear for their safety or the safety of a family member;
6. plaintiff clearly demanded that defendant stop the harassing behavior; and
7. the harassing behavior has been reported to the police as a stalking offense.

TEX. CIV. PRAC. & REM. CODE § 85.003. The statute defines harassing behavior as "conduct by defendant directed specifically toward the claimant, *including* following the claimant, that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass the claimant." *Id.* at 85.001(4) (emphasis added). The word "including" in section 85.001(4) does not limit the set of circumstances by which harassment occurs. Quite the contrary, "including" enlarges the definition of harassing behavior; the descriptors following "including" do "not create a presumption that

components not expressed are excluded." *Sneed v. Webre*, 465 S.W.3d 169, 190 (Tex. 2015) (quoting TEX. GOV'T CODE § 311.005(13)).

Defendants engaged in harassing behavior during each of the 27 days by picketing, protesting, and broadcasting in front of Dr. Fu's home, while also advocating violence against Dr. Fu.[11] Moreover, as video evidence documents, Defendants seek to harass and torment Dr. Fu. .[12] A month-long siege of a Dr. Fu's home harassed, annoyed, alarmed, abused, tormented, and embarrassed him and his family, as it would any person of normal sensibilities. Because of Defendants' actions, Dr. Fu reasonably fears for his and his family's safety, especially considering that Guo and his agents have demonstrated their propensity, when afforded the opportunity, to wreak violence on their targets.[13]

Defendants' campaign of harassing behavior included threats to inflict harm on Dr. Fu.[14] Indeed, Defendants advocate that Dr. Fu should be killed or eliminated as part of Guo's global elimination campaign.[15] The Mandarin word that Guo used was "灭"or "mie." This is the same word that Mao Zedong used when issuing orders against the Chinese Nationalist government and military.[16] This word always means to kill, destroy, or exterminate in the most literal way. The apparent ability and oft-repeated desire to carry out these threats have caused Dr. Fu, with good reason, to flee his home.[17] With Guo's agents posted directly in front of his home and growing in number, Dr. Fu took prudent steps to protect himself and his family by leaving his home to escape

---

[11] Exhibit A at p. 2.
[12] *Id.*; *see also generally*, Exhibits D-1 – D-5.
[13] *See generally* Exhibit A; Exhibit I; Exhibit J; Exhibit K; Exhibit L.
[14] *See generally* Exhibit A; *see also* Exhibits D-1 – D-5.
[15] Exhibit A at p. 2; Exhibit D-4.
[16] *Id.*
[17] *Id.*; Exhibit I; Exhibit J; Exhibit K; Exhibit L.

the threats of harm and potential imminent harm.[18] Upon the advice of law enforcement, he remained displaced for weeks.[19]

Dr. Fu urged Guo's agents to cease their campaign of harassment so he could return to the peace and tranquility of his home. These pleas were unavailing.[20] While Guo and his agents have not returned to Midland since the November elections to continue the campaign of threats, harassment, and elimination, Defendants have vowed to come back and stay until they accomplish their unlawful goal[21] of eliminating Dr. Fu, ruining his good name, and/or undermining his important work he performs.[22]

Although Plaintiff's evidence cannot be reasonably controverted by any Defendant, Dr. Fu need not show that he will actually prevail against Defendants to warrant a preliminary injunction. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987); *Coalition of Concerned Citizens to Make Art Smart v. Federal Transit Admin. of U.S. DOT*, 843 F.3d 886, 901 (10th Cir. 2016); *see also Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). While Defendants' rights of expression enjoy constitutional protection, Defendants have grossly exceeded those protections. *See* Tex. Civ. Prac. & Rem. Code. § 85.005.

***ii. Plaintiff Has Already Sustained and Will Continue to Sustain Irreparable Injuries as a Result of The Mob of People Outside His Home, Because He Has Been Forced to Flee For His Own and His Family's Safety.***

Mass gatherings of hostile people, including Defendants, congregated and targeted Dr. Fu's home for 27 days, with vows to return and continue the highly organized, lavishly financed

[18] Exhibit A at p. 2-3.
[19] *Id.*
[20] Exhibit A at p. 3; Exhibit E.
[21] Exhibit A at p. 1; Exhibit N.
[22] *See generally* Exhibit A.

campaign of harassment. They were unrelenting.[23] To meet the irreparable harm standard, an injury must be one which cannot be accurately measured. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). Several circuits hold that the breach of a person's right to privacy constitutes irreparable injury. *See Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000); *see also Deerfield Med. Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("the right of privacy must be carefully guarded for once an infringement has occurred it cannot be undone by monetary relief."). Moreover, residential privacy, including protecting a resident from being held captive within one's home is deserving of an appropriate injunctive remedy. *Frisby v. Schultz*, 487 U.S. 474, 484 (1988) (quoting *Rowan v. Post Office Dept.*, 397 U.S. 728, 738 (1970)).

Under the circumstances before this Court, Dr. Fu has been forced to make a choice—either to abandon his home and thereby maintain his safety and privacy, or return to his home where threats abound. This is a situation that no one in a free society should be forced to endure. Dr. Fu's request for injunctive relief protects his interests without in any manner violating the rights of Defendants.

***iii. Granting a Preliminary Injunction Would Not Cause Substantial Harm to Defendants or Others Because the Requested Relief Would Permit Guo and his agents to Picket, While Restoring Security and Some Sense of Normalcy to Dr. Fu's Life.***

A third factor justifying the proposed relief considers and balances the respective hardships on the parties. *See e.g. eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). By granting Dr. Fu's requested relief, an appropriate balance is struck.

It is well established that courts will not issue injunctions to combat defamation actions. That is not the case here. Dr. Fu makes no request for a content-based injunction. *Metro. Opera*

[23] *Id.* at p. 2; *see generally* Exhibits B-1 – B-5.

*Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *see also Kramer v. Thompson*, 947 F.2d 666, 677 (3d Cir. 1991) ("[T]he maxim that equity will not enjoin libel has enjoyed nearly two centuries of widespread acceptance at common law."). Instead, Plaintiff seeks a content-neutral, time, place, and manner injunction. While content-based injunctive relief is subject to strict scrutiny, Dr. Fu's requested time, place, and manner restrictions would be subject to a lesser standard. *Compare Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 391 (1973) (content-based restrictions); *with Frisby v. Schultz*, 487 U.S. 474, 481 (1988) (time, place, manner restrictions). Even still, the Supreme Court has seen fit to place content-neutral injunctions between regular time, place, manner restrictions and content-based restrictions. It has held that these kinds of injunctions cannot burden more speech than necessary to serve a significant government interest. *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994). Here, the content of Defendants' speech would not be the subject of the requested injunction. Instead, Plaintiff asks this Court to prohibit Defendants from using their rights to accomplish an unrestrained exploitation of Plaintiff's privacy rights. The requested preliminary injunction will not burden Defendants any more than necessary; it is a much needed prophylactic measure. In practical terms, Defendants must incur substantial costs to engage in the offensive and unlawful violations of Plaintiff's legally protected rights to privacy. Ironically, by granting Plaintiff's requested relief, Defendants will *forgo* further expenditures—rather than incur them—if the complained of conduct is enjoined.

***iv. The Public Interest Favors a Preliminary Injunction Because it Balances the Sanctity and Privacy of the Home With Any Free Speech Interests At Issue.***

Plaintiff readily concedes that enforcement of his right of privacy should not result in the denial of Defendants' constitutional rights. This Court is called upon to balance the rights of the parties. The rationale for that balancing extends beyond the immediate litigation between the parties. *See e.g., eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 26 (2008). No fundamental right is absolute, especially when it is used to skirt responsibility for one's misdeeds. *See e.g., Kovacs v. Cooper*, 336 U.S. 77, 85 (1949) ("even the fundamental rights of the Bill of Rights are not absolute.").

Case law from the Supreme Court and the circuit courts of appeals provides ample guidance to assist this Court in properly balancing the parties' rights. For example, in *Frisby v. Schultz*, the Supreme Court upheld a city ordinance which outlawed picketers targeting a home. 487 U.S. 474, 488 (1988). Writing for the majority, Justice O'Connor stated that the State has a venerable interest in protecting the peace, tranquility, and privacy of the home. Indeed, it is an interest "of the highest order in a free and civilized society." *Id.* at 484 (quoting *Carey v. Brown*, 447 U.S. 455, at 471 (1980)).

Likewise, the Second Circuit has addressed similar circumstances when reviewing a district court injunction. In *Galella v. Onassis*, 487 F.2d 986 (2d Cir. 1973), a paparazzo invaded the lives of a former first family. Galella took pictures of John F. Kennedy Jr. jumping in the boy's path to snap a photograph; interrupted Caroline Kennedy playing tennis; and piloted a power boat "uncomfortably close" to Mrs. Onassis. *Id.* At 992. The district court issued a temporary restraining order, enjoining Galella from "harassing, alarming, startling, tormenting, touching [Onassis]…or her children…and from…invading their immediate zone of privacy…" *Id.* And

ultimately, the court fashioned an injunction enjoining Galella from approaching within 100 yards of Onassis' home, or within 50 yards of her or her children. *Id.* at 993.

A permanent injunction has essentially the same requirements as a preliminary injunction, except that a permanent injunction requires actual success on the merits as opposed to a substantial likelihood of success. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12 (1987). The Second Circuit completely rejected Galella's argument that his First Amendment rights immunized him from injunctive relief. *Id.* at 995-97. While the court found parts of the permanent injunction to be overbroad, the injunction was allowed to prohibit "any act foreseeably or reasonably calculated to place the life and safety of defendant in jeopardy; and […] any conduct which would reasonably be foreseen to harass, alarm or frighten the defendant." *Id.* at 998. This modification was made in order to protect Galella's "reasonable efforts to 'cover' defendant" and to put him on the same playing field as other photographers. *Id.* Although the *Galella* Court reversed the portion of the injunction that enjoined Galella from approaching within 100 yards of Onassis' home, that case was decided prior to *Frisby.* Additionally, there was a second injunction at issue in *Galella*, about which the government intervened and sought relief. *Id.* at 992, 999. That injunction was also expanded to enjoin Galella from entering the Kennedy children's schools, and from engaging in the same conduct as enumerated in the Onassis injunction. *Id.* at 999. Dr. Fu, like Jacqueline Onassis, has a minor child, and Fu's requested injunction is not only reasonable, fair, and balanced, it seeks to enjoin conduct similar to that prohibited by injunctions already approved by prior decisions.

1. *The injunction would be narrowly tailored to serve this significant governmental interest, while leaving open ample alternative channels for communication.*

In order for restrictions to be imposed on the time, place, or manner of speech, the restriction must be narrowly tailored in furtherance of a significant governmental interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Additionally, the regulation must leave open "ample alternative channels for communication of the information." *Id.* (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). Even a complete ban can pass Constitutional muster if each activity within the proscription's scope is an appropriately targeted evil. *Frisby*, 487 U.S. at 485. The Court found the city ordinance in *Frisby* to be one of rare complete bans which also met requisite tailoring.

The relief requested by Dr. Fu is consistent with this body of precedent. The narrow-tailoring requirement is satisfied if the restriction promotes the substantial governmental interest, which would otherwise be achieved less effectively without regulation. *Id.* at 799. Dr. Fu's content-neutral injunction request meets the augmented time, place, manner test; the proposed relief burdens no more speech than is necessary to serve a significant government interest. *See Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994) (emphasis added). Plaintiff's requested relief clears this hurdle as well.

Without the reasonable restrictions on Defendants' conduct such as those proposed herein, the government interest (which is evidenced by the State Legislature providing the underlying causes of action) in preserving the special status of the home would be stymied. *See e.g., Frisby*, 487 U.S. at 485. Defendants' siege of Dr. Fu at his home was, and would continue to be, unreasonable, and warrants Dr. Fu's request for judicial intervention. Denial of an injunction within the parameters proposed would amount to a surrender of Dr. Fu's home privacy.

Accordingly, Dr. Fu asks the Court to draw the line marking the contours between Defendants' speech rights and Dr. Fu's right of privacy so as to prevent Defendants from overrunning Dr. Fu's constitutionally-protected interests, as has already occurred.

Since *Frisby* and *Galella*, courts have considered varying iterations of the same problem, namely, balancing a homeowner's right to privacy against another person's right to protest – or in other words, how appropriately to tailor these types of injunctions. For example, in *McMillan*, the Fifth Circuit affirmed the trial court's denial of a preliminary injunction, in part because of the qualitative difference between the facts then before the court and those in *Frisby*. *See Mississippi Women's Medical Clinic v. McMillan*, 866 F.2d 788, 796 (5th Cir. 1989). *McMillan* involved an abortion clinic requesting injunctive relief against protestors to prevent them from approaching within 500 feet of the facility and using terms such as "kill," "murder," and "butcher." *See id.* at 791. Not only was a portion of this requested injunction content-based, it also concerned a commercial enterprise—a clinic—rather than a home. *See generally id.* at 796. In contrast, Dr. Fu is asking this Court to prohibit a specific *form* of speech—picketing with the specific target (him and his family) at his home.

In *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994), the Supreme Court again considered time, place, manner restrictions. While the Court struck down the injunction prohibiting protestors from approaching within 300 feet of the clinic, it did so in part because the record lacked "sufficient justification" for the 300-foot ban. *See id* at 775. In stark contrast to the circumstances in *Madsen*, this case involves a residential neighborhood and an individual's home as the protestors' target. Dr. Fu and his family were driven away from their own residence. Knowingly and intentionally, Defendants deprived Dr. Fu's ability to live and rest at his home. In like manner,

Defendants have interfered with the quiet possessory rights of the residents of the Polo Park neighborhood, especially Dr. Fu's neighbors on Bishops Castle Drive.[24]

Protection of more generalized marching throughout a neighborhood is not the scenario before this Court. *See e.g., Frisby,* 487 U.S., at 484. To the contrary, picketers target Dr. Fu's home with impunity and have been so many in number that they necessarily span over a larger area than the facts presented in *Frisby*. Accordingly, an injunction of larger scope is needed to restore peace and tranquility to the home.[25] In a related matter, the *Madsen* Court addressed this situation in a commercial context by upholding a portion of an injunction prohibiting picketing within 36 feet of the clinic's driveway. *Madsen,* 512 U.S., at 769-70. While the Court did not explicitly state it, a 36-foot zone in all directions tends to imply that preventing a targeted protest in front of a home is not strictly limited to exactly in front of that person's home─provided the circumstances warrant it. The *Madsen* Court reasoned that unfettered ingress and egress provided a sufficient circumstance for the 36-foot injunction. *Id.* at 769. Here, the proposed injunction seeks the very same rights of ingress and egress to and from Dr. Fu's home, preserving Dr. Fu's right to use his driveway in the rear of the home, accessible only by way of an alley.[26] Dr. Fu and his family not only use their driveway to park their vehicles, the Fu's also need ingress and egress at the front of their home to welcome visitors.[27] To allow ingress and egress from the family's driveway requires unfettered access to the alleyway, which begins at each end of the block. *Madsen* also supports an injunction for ChinaAid property as well as it relates to points of ingress and egress. The reason

---

[24] *See generally* Exhibit A at p. 2; Exhibit C; Exhibit M.
[25] Exhibit A at p. 2; *see generally,* Exhibit B-4.
[26] Exhibit A at p. 4; Exhibit H.
[27] Exhibit A at p. 4.

why plaintiff requests an injunction of 50 feet (rather than the 36-foot injunction in *Madsen*) is because ChinaAid's property is located on Big Spring Drive, a major Midland thoroughfare.

The caselaw in this arena has been helpfully elaborated by the Eighth Circuit Court of Appeals. While not binding on this court, that circuit's developing body of jurisprudence is instructive. In *Kirkeby v. Furness*, the court was faced with a Fargo, North Dakota residential picketing ordinance. *Kirkeby v. Furness*, 92 F.3d 655, 658 (8th Cir. 1996). This ordinance, however, was content-based. It banned picketing "for the purpose of persuading the public or an occupant of such premises or to protest some action, attitude, or belief." *Id.* at 659. Since Dr. Fu is not asking for a content-based injunction, *Kirkeby* is inapposite. Later, in *Douglas*, the Eighth Circuit upheld another picketing ordinance. The court reasoned that *Frisby* does not create a bright-line rule permitting limits only on picketing solely in front of the targeted residence. *Douglas v. Brownell*, 88 F.3d 1511, 1519 (8th Cir. 1996). *Douglas* is one of the first cases concerning restrictions about adjacent homes of a targeted residence. The court recognized that the protestors in *Frisby* congregated only in front of the physician's home, whereas in the facts of *Douglas,* the protestors spilled over in front of neighboring homes. *Id.* at 1514, 1520 (the protestors in *Douglas* spanned, at one point, from 1500-1700 block of N.W. 100th Street). The distance between the 1500 and 1700 blocks is slightly more than 1000 feet, which is substantially similar to Plaintiff's requested relief.[28] Because the picketing in *Douglas* was more expansive, the court cogently reasoned that the prohibition could also be more expansive. *Id.* The Defendants and other picketers in this case were numerous just as in *Douglas*, thus permitting an injunction which is larger in scope.[29]

[28] *Compare* Exhibit H; *with* Exhibit O.

[29] Exhibit A at p. 3; *see generally,* Exhibit B-4.

On balance, the proposed preliminary injunction is supported by both the law and the facts inasmuch as the relief sought goes no further than needed to redress the harms Dr. Fu has suffered and likely will suffer. The proposed injunction also permits Dr. Fu to access his property free of interference from Defendants and their picketers. Defendants' threats, their repetitious gathering at Dr. Fu's residence for nearly a month, and their constant, offensive and intruding presence have gone far beyond the reasonable bounds of protesting.[30]

Dr. Fu's right to privacy and protection are weighty considerations and outweigh the picketers' sweeping claim to an unqualified right to harass. *See Galella*, 487 F.2d 986, 995 (2d Cir. 1973). It is clear that the rationale in *Frisby* supports an injunction on the facts before the court. Indeed, the holding in *Frisby* would be hollow if a court could not issue an injunction premised on these facts. Nor would the requested injunction run afoul of Defendants' First Amendment rights. *Frisby*, 487 U.S., at 475. To the contrary, the requested injunction would burden no more speech than necessary in order to restore Dr. Fu's rights of privacy and tranquility in his and his family's home. *Madsen*, 512 U.S. at 765.

To be sure, the picketing in this case is "in the wrong place—like a pig in the parlor instead of the barnyard." *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 750 (1978) (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926)). It can no longer remain unchallenged. For the sake of balance of rights, personal privacy, and security, Bob Fu respectfully requests that the proposed injunctive relief be granted.

[30] Exhibit A at p. 2-3; *see generally* Exhibits B-1 – B-5.

## II. CONCLUSION AND PRAYER

Put simply, Guo has a textbook *modus operandi*. He employs his celebrity status, seemingly limitless funds, and his vast array of media platforms to recruit, train, and deploy his myriad agents, including the other Defendants, to engage in "campaigns" involving unlawful and harassing conduct, including stalking. Pastor Fu is one of the latest victims of such wrongful conduct and a veritable multitude of defamatory statements published by Defendants.

As evidenced herein, when these Guo mobs assemble and are left unchecked, they commit violent acts against Guo's targets and those who associate with those targets.[31] There is no reason for this Court to assume that this situation, if left unchecked, will have a different outcome than violence and other harms to Dr. Fu and those around him.[32]

In our Constitutional democracy, First Amendment rights are indeed sacrosanct. But they cannot appropriatedly be employed as a shield by those seeking to incite and carry out violent acts. In the latter circumstances, constitutional protections fall away and the defendants' threats of violence become the appropriate subject of judicial redress. Simply stated, the First Amendment does not pronounce a healing benediction on threats of personal violence.

For the foregoing reasons, Bob Fu respectfully requests that, after proper service of Plaintiff's motions and applications for preliminary injunctions, and following a properly noticed hearing, the Court preliminarily enjoin Defendants, their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from directly or indirectly:

[31] *See* Exhibit I; Exhibit J; Exhibit K; Exhibit L.
[32] *See* Exhibit I; Exhibit J; Exhibit K; Exhibit L.

1) Picketing outside Dr. Bob Fu's home or anywhere else on Bishops Castle Drive in Midland, Texas. Picketing is defined as "posting at a particular place." *Frisby*, 487 U.S. at 482.

2) Approaching within one-hundred (100) feet of Dr. Bob Fu, his wife, and his children;

3) Picketing within fifty (50) feet of any point of ingress and egress at the ChinaAid office property; and

4) Granting any further relief that this Court deems just and proper.

Respectfully submitted,

By: */s/ Terry W. Rhoads*

**Lawrence P. Wilson**
***Lead Counsel***
Texas Bar No. 21704100
Larry.wilson@lanierlawfirm.com

**W. Mark Lanier**
Texas Bar No. 11934600
wml@lanierlawfirm.com

**Kenneth W. Starr**
Texas Bar No. 24106919
ken.starr@lanierlawfirm.com

**Kevin P. Parker**
Texas Bar No. 15494020
Kevin.parker@lanierlawfirm.com

OF

**THE LANIER LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N
Suite 100
Houston, TX 77064
(713) 659-5200

and

**Terry W. Rhoads**
State Bar No. 16811750
trhoads@cbtd.com

**Julian E. Whitley**
State Bar No. 24108913
jwhitley@cbtd.com

OF

**COTTON, BLEDSOE, TIGHE & DAWSON**
A Professional Corporation
P. O. Box 2776
Midland, Texas 79702
(432) 684-5782
(432) 682-3672 (Fax)

and

**K. Lawson Pedigo**
SBOT 15716500
klpedigo@mkp-law.net

OF

**MILLER KEFFER & PEDIGO PLLC**
3400 Carlisle Street, Suite 550
Dallas, Texas 75204
(214) 696-2050

**ATTORNEYS FOR PLAINTIFF,
XIQIU ("BOB") FU**

**CERTIFICATE OF SERVICE**

I certify that, on December 31, 2020, I filed the foregoing Plaintiff's Motion for Preliminary Injunction via the Court's ECF/CM system. I further certify that Exhibits B and D in their entirety will be hand delivered to the Court via a USB drive. I further certify that I stand ready to serve all Defendants and or their counsel of record once each has made an appearance, including individual USB drives containing Exhibits B and D in their entirety.

*/s/ Terry W. Rhoads*
**Terry W. Rhoads**